## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| TERI LEE,                  ) | |
|                      ) | |
|      **Plaintiff,**      ) | |
|                      ) | |
| **v.**                     ) | **Case No. 3:10-cv-809** |
|                      ) | **Judge Trauger** |
| **EQUIFIRST CORP., HOMEQ SERVICING**   ) | |
| **CORP., QUANTUM SERVICING CORP.,**    ) | |
| **SUTTON FUNDING, LLC, and**        ) | |
| **ROOSEVELT MORTGAGE**           ) | |
| **ACQUISITION CO.,**             ) | |
|                      ) | |
|      **Defendants.**      ) | |

## MEMORANDUM

Pending before the court are the Motions to Dismiss filed by defendants EquiFirst Corp.

(Docket No. 5), Quantum Servicing Corp. (Docket No. 24), and Roosevelt Mortgage Acquisition

Co. (Docket No. 25), to which the plaintiff has filed responses (Docket Nos. 17, 26, 27).  For the

reasons discussed below, EquiFirst's and Roosevelt's motions will be granted in part and denied

in part, and Quantum's motion will be denied.

## BACKGROUND

The plaintiff, Teri Lee, took out two mortgage loans to purchase her residence in

Nashville, Tennessee.[1]  The larger of the two loans, which the plaintiff refers to as the "Primary

Loan," was in the amount of $152,000.  Eventually, she missed payments on that loan, and this

---

[1] Unless otherwise noted, the allegations are drawn from the plaintiffs' Complaint
(Docket No. 1, Ex. 1).

1

action arises from the resulting foreclosure.

At the March 2, 2007 closing of the plaintiff's home purchase, defendant EquiFirst Corp. ("EquiFirst") held the promissory notes and the servicing rights to both loans. The Complaint alleges that, on May 1, 2007, EquiFirst assigned the servicing rights of the Primary Loan to defendant HomEq Servicing Corp. ("HomEq"). On May 14, 2007, HomEq allegedly sent the plaintiff a "Validation of Debt" letter listing EquiFirst as the current creditor.

The plaintiff's deed of trust required her to have an insurance policy for her property, and she allegedly maintained sufficient coverage for the duration of the loan. Lee alleges that on two occasions – May 13, 2008 and October 14, 2008 – HomEq charged her for additional, unnecessary insurance policies, because it failed to discover that she already had insurance. These charges totaled approximately $4,700. This additional expense allegedly caused the plaintiff to fall behind on her mortgage payments.

On February 25, 2009, the plaintiff allegedly received a notice of acceleration of the Primary Loan from law firm Shaprio & Kirsch, LLC, which identified the current creditor as defendant Sutton Funding, LLC ("Sutton"). The next month, Lee received a notice of foreclosure from the same law firm.

At that point, the plaintiff called HomEq, which allegedly offered her a forbearance agreement. Under the proposed plan, the plaintiff would immediately pay $3,500 and would then pay increased monthly payments until November 2009, at which point her account would be current. The plaintiff accepted these terms and allegedly signed an agreement (the "Forbearance Agreement") with HomEq on March 27, 2009. The agreement provided that it would be binding

upon the parties' "successors and assigns." (Docket No. 1, Ex. 1 ¶ 24.)

HomEq accepted Lee's up-front payment and the increased monthly payment for April 2009. Then, on May 15, 2009, HomEq transferred the servicing rights for the Primary Loan to defendant Quantum Servicing Corp. ("Quantum"). On May 22, 2009, Lee received a "Validation of Debt" letter from Quantum listing defendant Roosevelt Mortgage Acquisition Co. ("Roosevelt") as the current creditor. The letter informed Lee that she was more than $6,900 in arrears, and it did not reference the Forbearance Agreement. The plaintiff called Quantum's customer service line but was unable to resolve the issue.

The May 2009 account statement Lee received from Quantum listed the standard monthly amount due, not the increased amount negotiated in the Forbearance Agreement. The plaintiff alleges that the amounts she paid HomEq under the Forbearance Agreement left her unable to pay Quantum the balance that Quantum asserted was due. By this point, the plaintiff was allegedly suffering from severe emotional distress and anxiety, for which she had seen a doctor and had received medication.

Through December 2009, Quantum sent several letters to the plaintiff informing her that her account was delinquent. On December 31, 2009, Quantum's legal counsel, Wilson & Associates, PLLC, sent Lee a notice of foreclosure and acceleration. The notice did not indicate the loan's current creditor.

Between January and March 2010, the plaintiff faxed several letters to Wilson & Associates and to Quantum seeking information about her account and her payment history. Their responses confirmed that the amount owed was valid but allegedly failed to answer the

plaintiff's specific questions.  On March 24, 2010, the plaintiff's home was sold at a foreclosure sale.

The plaintiff alleges that the deed of trust for her property was recorded by Mortgage Electronic Registering Service ("MERS"), of which all of the defendants are members.  The deed of trust provided that MERS was the "beneficiary under this security instrument" and was "acting solely as a nominee for Lender and Lender's successors and assigns."  (*Id.* ¶ 60.)  The defendants allegedly use MERS "to avoid listing the chain of title in the county registry."  (*Id.* ¶ 61.)  The plaintiff claims that this made it impossible for her to determine who the creditor for the Primary Loan was at any given time.

The plaintiff asserts four causes of action.  First, she claims that HomEq was negligent in charging her for unnecessary insurance and that EquiFirst, as the creditor of the loan and as HomEq's principal, is vicariously liable.  Second, she claims that HomEq and Quantum were negligent in failing to ensure that her Forbearance Agreement was honored when the servicing of her loan was transferred between the companies and that Sutton, EquiFirst, and Roosevelt are vicariously liable as principals.  Third, she claims that her letters to Quantum in the three months before foreclosure were "qualified written requests" under the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, that Quantum's inadequate responses violated RESPA, and that EquiFirst is vicariously liable as the creditor.  Finally, she claims that foreclosure was wrongful, citing all of the alleged misconduct and the fact that "the original note securing her loan was not presented by the seller or physically transferred to the buyer at the foreclosure sale."  (*Id.* ¶ 62.)  The plaintiff initially filed this suit in Tennessee state court, but

EquiFirst removed to this court on federal question grounds.

**ANALYSIS**

Defendants EquiFirst, Quantum, and Roosevelt have each filed Motions to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.     Motion to Dismiss Standard

The Federal Rules of Civil Procedure require plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court must assume that all of the factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950 (2009).

Generally, a complaint does not need to contain "detailed factual allegations," although its allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555, 556 n.3. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). The factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* at 1949-50. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

## II.     EquiFirst

Defendant EquiFirst primarily argues that, because it sold the plaintiff's loan soon after origination, it is not liable for the conduct alleged in the Complaint. EquiFirst asserts in its brief that it sold the plaintiff's loans "shortly after the March 2007 closing" (Docket No. 6 at 5), and it has submitted a declaration from an EquiFirst Vice President stating that EquiFirst sold the loans to Sutton on March 30, 2007 and transferred servicing of the loans to HomEq on May 1, 2007 (Docket No. 18 ¶¶ 3, 5). This was before any of the allegedly tortious conduct occurred.

The plaintiff's response brief does not directly address EquiFirst's arguments. Instead, the plaintiff asks the court to stay any ruling until she can take discovery regarding: (1) the date upon which EquiFirst ceased being the plaintiff's creditor; (2) the identity of the party to which EquiFirst sold the loan; and (3) whether Equifirst ever reacquired a financial interest in the plaintiff's loan. (Docket No. 17 at 1.)

The court notes that the allegations in the Complaint contradict the evidence offered by EquiFirst. EquiFirst maintains that it sold the loans on March 30, 2007, but the Complaint alleges that, on May 14, 2007, the plaintiff received a "Validation of Debt" letter from HomEq listing EquiFirst as the current creditor. The plaintiff allegedly received no information to the contrary until February 2009, when a notice of acceleration indicated that Sutton was the current creditor. These allegations, taken as true, are sufficient to plausibly support the contention that EquiFirst was the creditor of the loan, and thus was HomEq's principal, in 2008, when HomEq

charged the plaintiff for additional insurance. *See Iqbal*, 129 S. Ct. at 1949. At this stage, the court will not consider EquiFirst's declaration to the contrary. "When reviewing a motion to dismiss, a district court may not consider matters beyond the complaint."[2] *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008).

The Complaint, however, contains no allegations suggesting that EquiFirst was involved in the loan, as either creditor or servicer, after February 2009. Instead, all of the documents received by the plaintiff after that point indicated that either Sutton or Roosevelt was the creditor. This is relevant because, although the plaintiff seeks to hold EquiFirst liable on all four of her claims, only the insurance-related claim is based on conduct that occurred before February 2009. Nothing in the Complaint indicates that EquiFirst owned the loan when: (1) the plaintiff signed the Forbearance Agreement; (2) the plaintiff sent her RESPA requests to Quantum; or (3) the plaintiff was foreclosed on. Accordingly, the court will dismiss all claims against EquiFirst other than the insurance-related claim.[3]

EquiFirst's remaining arguments do not warrant dismissal of the insurance-related negligence claim. First, EquiFirst summarily states that it "is not aware of a cause of action under Tennessee law for 'negligently placed insurance'" (Docket No. 6 at 5), but it cites nothing for the proposition that a mortgage servicer may, without incurring liability, negligently charge a mortgagor for excessive insurance coverage. At the least, the plaintiff's allegations suggest that

---

[2] Given the plaintiff's asserted need for discovery on this issue, the court declines to convert EquiFirst's motion into a Motion for Summary Judgment.

[3] If discovery ultimately shows that EquiFirst owned the loan at a later date, the plaintiff may move to amend her Complaint as necessary to re-assert the relevant claims against EquiFirst.

HomEq negligently misrepresented to her that additional insurance costing $4,700 was required by the terms of her loan. *See* Restatement (Second) of Torts § 552 (1977) (allowing liability against businesspeople who negligently "suppl[y] false information for the guidance of others in their business transactions"). The defendant may brief this issue in more detail in the future, but the court will not, at this stage, dismiss the claim.

Next, EquiFirst argues that the plaintiff's allegations do not support a finding of vicarious liability for HomEq's actions. (Docket No. 6 at 6-7.) In Tennessee, "[t]o hold a principal liable for the acts of another, a plaintiff must prove (1) that the person causing the injury was the principal's agent and (2) that the person causing the injury was acting on the principal's business and acting within the scope of his or her employment when the injury occurred." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 120 (Tenn. Ct. App. 2005). As the First Circuit has noted, "[t]ypically, a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan." *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 187 (1st Cir. 2006). The plaintiff has alleged that HomEq, as servicer, was attempting to enforce loan terms regarding minimum insurance requirements and that, in doing so, it was acting as an agent for EquiFirst, the mortgagee. This is sufficient to support vicarious liability.

Of course, if the evidence ultimately shows that EquiFirst did sell the loans in March 2007, then it will not be held liable for actions taken by the servicer in 2008. At this stage, though, the court can look only to the allegations of the Complaint. Accordingly, as to defendant EquiFirst, the court will allow the insurance-related negligence claim to go forward and will dismiss the remainder of the plaintiff's claims.

### III.     Quantum

Defendant Quantum argues that the plaintiff's claims against it are not viable for a variety of reasons. The plaintiff has failed to respond to Quantum's arguments and instead asks the court to stay any decision until certain unspecified discovery can be taken. (Docket No. 26 at 1.)

It is unclear what discovery the plaintiff needs or how that discovery will assist her in responding to Quantum's arguments. Therefore, her request for a stay will be denied. But, despite the plaintiff's lack of a substantive response, the court will not automatically grant Quantum's Motion to Dismiss. Instead, the court will examine the merits of Quantum's arguments to determine whether the defendant has met its burden of showing that the plaintiff has not stated a plausible claim for relief. *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991) (holding that, instead of granting an unopposed motion to dismiss simply because it is unopposed, the court must determine whether the movant has discharged his or her burden).

### A.     Forbearance Agreement

First, Quantum argues that the Complaint fails to state a claim for negligence related to its handling of the Forbearance Agreement.[4] The plaintiff alleges that Quantum breached a duty of care to her by failing to discover the existence of the Forbearance Agreement and by failing to properly address her concerns when she called customer service to dispute the amount owed. Quantum argues that it "did not owe Plaintiff a common-law duty to inquire into the existence of

---

[4] Quantum also addresses the plaintiff's insurance-related negligence claim (Docket No. 24, Ex. 1 at 6), but the plaintiff has not asserted that claim against Quantum, making the argument moot.

a forbearance agreement or provide customer service." (Docket No. 24, Ex. 1 at 7.) Instead, it claims that any such duty arose from Quantum's contractual obligations.

As an initial matter, "[a] duty rests on everyone to use due care under the attendant circumstances, and negligence is doing what a reasonable and prudent person would not do under the given circumstances." *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990); *Mayes v. LeMonte*, 122 S.W.3d 142, 145 (Tenn. Ct. App. 2003) (same, quoting *Dixon v. Lobenstein*, 132 S.W.2d 215, 216 (Tenn. 1939)); *see also Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992) ("Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise."). So, generally speaking, Quantum has a duty to exercise due care when undertaking its business.

In support of its argument, Quantum cites two cases, *Oak Ridge Precision Industries, Inc. v. First Tennessee Bank National Association*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992), and *Beal Bank, SSB v. Prince (In re Prince)*, 414 B.R. 285 (Bankr. M.D. Tenn. 2009). In *Oak Ridge*, the plaintiff manufacturing company took out a revolving loan with the defendant bank, and the loan agreement provided that the bank had the right to all of the plaintiff's accounts receivable. 835 S.W.2d at 27. The bank allegedly mismanaged the handling and collecting of the accounts receivable, and the plaintiff sued for, among other things, breach of contract and negligence. *Id.* at 27, 30. The Tennessee Court of Appeals affirmed the dismissal of the negligence claim, finding that it overlapped with the breach of contract claim. "Insofar as a breach of contract action is concerned, it matters not whether the breach was intentionally or unintentionally caused by negligence in attempting performance, the action remains in contract." *Id.*

Here, however, the plaintiff has not alleged that Quantum was negligent in *attempting performance* of the Forbearance Agreement.  Rather, she has alleged that Quantum was negligent in failing to discover the existence of the agreement in the first place and in failing to respond to her customer service inquiries regarding the agreement.  Although Quantum argues that its duty to discover the agreement arose from "*a* contractual obligation" (Docket No. 24, Ex. 1 at 7 (emphasis added)), it does not specify which contract gave rise to that duty – whether it was a contract directly with the plaintiff, or if it was instead a contract with HomEq or the mortgagee.  The allegations in the Complaint do not address this issue.  Accordingly, *Oak Ridge* is not directly on point, and it does not appear, at least at this stage, that the plaintiff's negligence claim is merely a recast contract claim.[5]

*In re Prince* is more relevant, but the bankruptcy court's reasoning in that case is not entirely persuasive.  There, the plaintiff mortgagors sued the mortgagee, the servicing agent, and a servicing agent that had subcontracted with the initial servicing agent.  *In re Prince*, 414 B.R. at 290.  The plaintiffs alleged that the defendants, which had foreclosed on the plaintiffs' property, had "failed in their duty to maintain accurate and truthful records of the [the plaintiffs'] mortgage payments and history."  *Id.* at 297.  The court dismissed the claim, citing the economic loss rule, "which prohibits recovery in tort for purely economic losses, as distinguished from loss related to personal injury or property damage, resulting from a breach of contract."  *Id.*  Based on this rule, the court found that there was no "duty of care owed by the defendants . . . outside their

---

[5] If it becomes clear in the future that the negligence claim against Quantum *is* more properly brought as a contract claim, Quantum will not, of course, be dismissed from the suit. Instead, the plaintiff will receive leave to amend her Complaint.

contractual relationship." *Id.* at 298.

The court is unpersuaded by the defendant's citation to *In re Prince* for several reasons. First, the plaintiff here is not suing for merely economic losses. She seeks damages related to the severe emotional distress caused by Quantum's negligence, and, more importantly, damages related to the foreclosure of her house. It is unclear how the plaintiff's loss of her home can be considered a purely economic loss.[6] Second, *In re Prince* seems to conflate two questions: (1) whether a duty of care exists, and (2) whether the plaintiff's recovery is barred by the economic loss rule. But the economic loss rule affects only whether a plaintiff can recover damages, not whether the defendant owed a duty of care.

Third, at least several Tennessee courts have held that, in cases outside of a product-liability or product-sales context, the economic loss rule is designed to prevent recovery in negligence when the parties *lack* privity of contract. *See, e.g.*, *Acuity v. McGhee Eng'g, Inc.*, 297 S.W.3d 718, 734 (Tenn. Ct. App. 2008) ("The economic loss doctrine provides that, *absent privity of contract*, one may not recover in negligence where there is no injury to person or property." (emphasis added)); *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 435 (Tenn. 1991) (noting that states are split on the application of the economic loss rule, with "the traditional view [being] that purely economic losses cannot be recovered in tort *absent privity*" (emphasis added)). Indeed, one case cited by *In re Prince* implicitly recognized that the rule does not apply when there is privity between the parties. *AmSouth Erectors, L.L.C. v. Skaggs*

---

[6] In *In re Prince*, the defendants had recognized that the foreclosure was in error and had voluntarily acted to set aside the foreclosure sale. 414 B.R. at 291. Thus, the damages did not include the loss of the plaintiffs' house.

*Iron Works, Inc.*, No. W2002-01944-COA-R3-CV, 2003 Tenn. App. LEXIS 551, at *13 (Tenn.

Ct. App. Aug. 5, 2003) (noting that, when an exception to the economic loss rule applies,

"privity between plaintiff and defendant is not required"), *cited in In re Prince*, 414 B.R. at 297.

But the court in *In re Prince* applied the rule to bar the plaintiff's claim *because* privity existed.

414 B.R. at 297-98. This appears to be a misapplication of Tennessee's economic loss rule.[7]

Because the court is not persuaded that either case cited by Quantum compels dismissal

of the plaintiff's negligence claim, the court will allow that claim to go forward.

## B.    RESPA Violation

Next, Quantum disputes the sufficiency of the plaintiff's allegations regarding her

RESPA claim. (Docket No. 24, Ex. 1 at 8-12.) The plaintiff alleges that Quantum failed to

properly respond to her inquiries regarding her loan.

RESPA requires a "servicer of a federally related mortgage loan" to respond to a

"qualified written request" sent by the borrower that seeks "information relating to the servicing

of such loan." 12 U.S.C. § 2605(e)(1)(A), (e)(2). The statute defines "qualified written

request":

> (B)  Qualified written request. For purposes of this subsection, a
> qualified written request shall be a written correspondence . . . that
> –

---

[7] This is perhaps explained by the fact that the primary case cited by *In re Prince* dealt with product liability claims, not ordinary negligence claims. *See McLean v. Bourget's Bike Works, Inc.*, No. M2003-01944-COA-R3-CV, 2005 Tenn. App. LEXIS 645, at *16-17 (Tenn. Ct. App. Oct. 7, 2005) (citing *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 133 (Tenn. 1995) (discussing product liability claims)), *cited in In re Prince*, 414 B.R. at 297; *see also, e.g.*, *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009) (discussing application of the economic loss rule in the context of a product liability claim).

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

*Id.* § 2605(e)(1)(B).

Upon receiving such a request, a servicer is required to acknowledge receipt within 20 days and to provide a substantive response within 60 days. § 2605(e)(2). The servicer must either (a) correct the error pointed out by the borrower or (b) conduct an investigation and provide a written explanation containing either "a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer" or "[the] information requested by the borrower or an explanation of why the information requested is unavailable." *Id.* § 2605(e)(2)(B)-(C). The statute also requires the servicer to avoid reporting information regarding overdue payments to credit agencies in the 60-day period following the qualified written request. *Id.* § 2605(e)(3). If a servicer violates these provisions, the borrower may sue to recover "any actual damages to the borrower as a result of the failure" and up to $1,000 in "additional damages . . . in the case of a pattern or practice of noncompliance with the requirements of this section." *Id.* § 2605(f)(1).

The Complaint outlines the plaintiff's correspondence with Quantum and its counsel:

1. On January 14, 2010, the plaintiff faxed a letter to Quantum "regarding questions about HomEq's accounting." (Docket No. 1, Ex. 1 ¶ 40.)

2. On January 28, she faxed a letter to Wilson & Associates,

PLLC ("Wilson"), Quantum's counsel, "requesting a detailed history of payments on the mortgage, specifically seeking explanation for 'unapplied funds' and payments applied to 'other' and those titled 'repay of escrow advance.'" (*Id.* ¶ 41.)

3.  On February 1, she faxed a letter to Wilson "asking for more detailed information on her Quantum loan" and faxed "a revised 'Dispute Debt Letter.'" (*Id.* ¶ 42.)

4.  On February 1, she received a letter from Wilson "saying only that they were awaiting their client's response." (*Id.* ¶ 43.)

5.  On February 2 or 3, she received a letter from HomEq stating that she "still owed them $16.28 and $2,040.06 in 'Advances' on her account." (*Id.* ¶ 44.)

6.  On February 9, she received a letter from Wilson "stating that her debt with Quantum was valid[,] with a ledger of payment history that answered none of the questions she posed in her qualified written request." (*Id.* ¶ 45.)  The letter "failed to address the specifics raised in her qualified written requests." (*Id.*)

7.  On February 23, she received a letter from Quantum "stating that all payments were applied correctly, addressing none of the questions she raised in any of her previous 'qualified written requests.'" (*Id.* ¶ 46.)

8.  On March 19, she faxed a letter to Wilson and Quantum "seeking detailed information." (*Id.* ¶ 47.)  Wilson responded with a letter "stating that their position had not changed and provided none of the information she requested." (*Id.* ¶ 48.)

9.  On March 23, she faxed a letter to Wilson and Quantum seeking unspecified information.  (*Id.* ¶ 49.)

Thus, the Complaint alleges that, on January 28, 2010, the plaintiff sent a letter to

Quantum's counsel "specifically seeking explanation for 'unapplied funds' and payments

applied to 'other' and those titled 'repay of escrow advance.'"[8]  (*Id.* ¶ 41.)  Although she received responses from Quantum and its counsel, the plaintiff alleges that none of the responses answered these questions.  Contrary to the defendant's arguments, these allegations are sufficient to state a claim under RESPA, because the plaintiff has specifically identified the subject matter of the information she sought and because the information was related to the servicing of her loan.[9]

Quantum argues that it sufficiently responded to the plaintiff's inquiries, and it attaches two letters that it sent to Lee, dated February 23, 2010 and March 26, 2010.  (Docket No. 24, Ex. 1 at 15-16.)  But the February 23 letter simply stated that "[a] review of [Lee's] loan indicates that all payments received on [the] loan were applied to [the] loan correctly" and attached the plaintiff's original loan documents.  (*Id.* at 15.)  The letter did not address any questions regarding unapplied funds or payments applied to "advances."  The March 26 letter appears to address some of these questions, but that letter is not referenced in the Complaint.  As explained above, the court will not, at this stage, consider evidence outside of the Complaint.  *Winget*, 537 F.3d at 576.

Quantum points out that only three of Lee's letters – those dated January 14, March 19,

---

[8] Notably, the plaintiff does not allege that her communications mentioned the Forbearance Agreement.

[9] Quantum argues that the allegations are insufficient because the plaintiff has not specifically alleged that she included her name and account number on her correspondence. (Docket No. 24, Ex. 1 at 9.)  But RESPA only requires the borrower to include information that "enables the servicer to identify" the borrower and loan.  12 U.S.C. § 2605(e)(1)(B)(i). Obviously, the plaintiff included sufficient information, because Quantum actually did respond to the plaintiff regarding her loan.

and March 23 – were sent directly to Quantum.  The rest of the communications were sent to Quantum's counsel, and the defendant argues that this was not sufficient to trigger its duty to respond.  (Docket No. 24, Ex. 1 at 9.)  It is true that some courts have held that sending a letter to a servicer's counsel is not sufficient under RESPA to constitute a qualified written request.  *E.g.*, *Bishop v. Quicken Loans, Inc.*, No. 2:09-01076, 2010 U.S. Dist. LEXIS 93692, at *18 (S.D. W. Va. Sept. 8, 2010) (collecting cases and noting that "numerous courts have dismissed a borrower's RESPA claim where the borrower failed to communicate directly with the servicer of the loan."); *Payne v. Mortg. Elec. Registration Sys., Inc. (In re Payne)*, 387 B.R. 614, 635 (Bankr. D. Kan. 2008) ("Before an attorney is to be held accountable as an agent by virtue of a statute which does not itself pre-authorize an attorney as the lender's agent in this context, the attorney should be placed on notice that he or she is being approached in that capacity.").

But at least one court has refused to dismiss a RESPA claim when the servicer's counsel actually forwarded the letter to the servicer.  *McLean v. GMAC Mortg. Corp.*, No. 06-22795-CIV, 2008 U.S. Dist. LEXIS 101275, at *17-18 (S.D. Fla. Dec. 16, 2008) (refusing to dismiss the claim, as a matter of equity, "where there is no evidence that [the servicer's] counsel contacted the plaintiffs and advised them to directly speak to [the servicer] and where [the servicer's] counsel forwarded the February 2005 Letter to [the servicer]").  Indeed, the plain text of RESPA simply provides that a servicer must respond to a qualified written request that it "receives."  12 U.S.C. § 2605(e)(1)(A).  Here, the plaintiff has alleged that Quantum's counsel forwarded the January 28 letter to Quantum; thus, the servicer did allegedly receive the letter.  At

this stage, the court finds that this is sufficient to state a claim under the statute.[10]

Finally, Quantum argues that the plaintiff has not pleaded facts that establish actual damages. (Docket No. 24, Ex. 1 at 11-12.) Courts have repeatedly held that "alleging a breach of RESPA duties alone does not state a claim under RESPA." *Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 383 (D.N.J. 2006). "Plaintiffs must, at a minimum, also allege that the breach resulted in actual damages." *Id.*; *see also, e.g.*, *Allen v. United Fin. Mortg. Corp.*, 660 F. Supp. 2d 1089, 1097 (N.D. Cal. 2009) (collecting cases).

The plaintiff alleges that Quantum's failure to respond to her questions led to the foreclosure of her home.[11] (Docket No. 1, Ex. 1 ¶ 57.) But this conclusory allegation is insufficient to support the plaintiff's claim. It is clear that the foreclosure was caused by the plaintiff's inability to pay the amount she owed; knowledge of why certain payments were applied in certain ways had no effect on the her ability to make loan payments. Accordingly, the alleged RESPA violation had no bearing on whether the plaintiff ultimately faced foreclosure. *See Allen*, 660 F. Supp. 2d at 1097 (N.D. Cal. 2009) (dismissing RESPA claim because the

---

[10] Under RESPA regulations promulgated by the Department of Housing and Urban Development, a servicer may, "[b]y notice either included in the Notice of Transfer or separately delivered by first-class mail, . . . establish a separate and exclusive office and address for the receipt and handling of qualified written requests." 24 C.F.R. § 3500.21(e)(1). At least one court has dismissed a RESPA claim because the plaintiff sent the request to the servicer's counsel instead of to the "separate and exclusive office and address" that the servicer had listed in the notice of transfer. *Bally v. Homeside Lending, Inc.*, No. 02 C 5799, 2005 U.S. Dist. LEXIS 20123, at *6-8 (N.D. Ill. Sept. 8, 2005). Here, however, nothing indicates that Quantum had established such an address.

[11] The Complaint also states that "Quantum should have ceased all negative reporting on Plaintiff's credit score" (*id.* ¶ 58), but it does not allege that Quantum made such reports or that the plaintiff's credit score was harmed. Thus, the plaintiff cannot premise her RESPA claim on Quantum's credit reporting.

plaintiff's foreclosure "appear[ed] to have been caused by his default").

The plaintiff has also, however, alleged that Quantum's RESPA violation caused her to suffer emotional distress.  (Docket No. 1, Ex. 1 ¶ 57.)  A number of courts have held that damages for emotional distress are recoverable under RESPA.  *See, e.g.*, *Wienert v. GMAC Mortg. Corp.*, No. 08-CV-14482, 2009 U.S. Dist. LEXIS 89881, at *32 (E.D. Mich. Sept. 29, 2009) ("[T]his Court concurs with the reasoning of the majority of other federal courts confronted with the question in finding that such emotional damages are a part and parcel of the 'actual damages' permitted by [RESPA]."); *Hutchinson*, 410 F. Supp. 2d at 383 n.14 (noting that district courts are split regarding whether "actual damages" under RESPA include emotional distress.  In light of this, and because the parties' briefs do not address whether emotional distress can constitute "actual damages," the court will allow the plaintiff's claim to go forward.

In sum, at this stage, the plaintiff's allegations are sufficient to state a RESPA claim against Quantum.

### C.    Wrongful Foreclosure

Finally, Quantum argues that the plaintiff has not alleged facts sufficient to support a wrongful foreclosure claim.  Quantum notes that "Tennessee courts have generally evaluated the propriety (or wrongfulness) of foreclosure by referencing the parties' contractual and statutory obligations."  (Docket No. 24, Ex. 1 at 12.)  The plaintiff alleges that "the foreclosure . . . was wrongful because the original note securing her loan was not presented by the seller or physically transferred to the buyer at the foreclosure sale."  (Docket No. 1, Ex. 1 ¶ 62.)  Quantum argues that, even if true, this does not affect the propriety of the foreclosure.  (Docket

19

No. 24, Ex. 1 at 12.)

But the plaintiff's wrongful foreclosure claim is not based solely on that allegation. Instead, it is based on all of the misconduct alleged in the Complaint. (*See, e.g.*, Docket No. 1, Ex. 1 at 1 (stating that the plaintiff "asserts that the foreclosure of her home was wrongful and makes the following complaint"), ¶ 36 (alleging that Quantum's failure to honor the Forbearance Agreement "eventually caused the wrongful foreclosure of her home").) Broadly speaking, the Complaint alleges that Quantum's failure to abide by the Forbearance Agreement resulted in excessive and erroneous charges, which caused the plaintiff to fall behind on her payments and directly caused the foreclosure. This is enough to support a claim for wrongful foreclosure.

## IV. Roosevelt

Defendant Roosevelt challenges three of the plaintiff's claims: (1) negligence regarding excessive insurance, (2) violation of RESPA, and (3) wrongful foreclosure.[12] (Docket No. 25, Ex. 1 at 7-9.) As to the negligence claim, the Complaint does not actually assert the claim against Roosevelt, so Roosevelt's argument is moot. As to the RESPA claim, the court will dismiss the claim because the relevant statutory provisions create liability only for "servicers."[13]

---

[12] As with its responses to the other two defendants, the plaintiff has not substantively responded to Roosevelt's motion and instead seeks a stay so that it can seek unspecified discovery. (Docket No. 27.) This request for a stay will be denied for the same reasons that the request regarding Quantum's motion was denied.

[13] The statute defines "servicer" as "the person responsible for servicing of a loan." 12 U.S.C. § 2605(i)(2). It further defines "servicing" as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." *Id.* § 2605(i)(3).

*See* 12 U.S.C. § 2605(e) (describing "[d]uty of *loan servicer* to respond to borrower inquiries" (emphasis added)). The plaintiff does not allege that Roosevelt ever serviced her loan. Finally, as to the wrongful foreclosure claim, the court will allow the claim to go forward for the reasons discussed above. As the creditor during the time that Quantum serviced the loan, Roosevelt faces vicarious liability for Quantum's actions.

**CONCLUSION**

For all of the reasons discussed above, EquiFirst's and Roosevelt's Motions to Dismiss will be granted in part and denied in part, and Quantum's Motion to Dismiss will be denied. All claims against EquiFirst will be dismissed, except for the negligence claim regarding unnecessary insurance, and the RESPA claim will be dismissed as to Roosevelt. The remainder of the plaintiff's claims will be allowed to go forward.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge